GERALD SINGLETON, SBN 208783
BRODY A. McBRIDE, SBN 270852
SINGLETON LAW FIRM, ACP
115 West Plaza Street
Solana Beach, California  92075
Tel.          (760) 697-1330
Fax.          (760) 697-1329
Email:        gerald@geraldsingleton.com
              brody@geraldsingleton.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTY and MAGGIE EMMONS, | Case No. 3:14-cv-1662-JM-DHB |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| CITY OF ESCONDIDO, EPD Chief of Police CRAIG CARTER, Former Acting EPD Chief of Police COREY MOLES, EPD Sgt. KEVIN TOTH, EPD Officers ROBERT CRAIG, HUY QUACH, JAKE HOUCHIN, and JOSEPH LEFFINGWELL; and DOES 1-50 inclusive. | Judge:   Hon. Jeffery T. Miller<br>Dept.:    5D<br>Date:     January 11, 2016<br>Time:     10:00 a.m. |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

//

//

//

//

//

# TABLE OF CONTENTS

**Page(s)**

**Table of Contents**……………………………………...……………………….……i

**Table of Authorities**……………………………….…………………………..…..ii-iv

I.     **Burden of Proof**………..…………………………………....……….…..........1

II.    **The Officers Violated Maggie's Fourth Amendment Rights**..................2-9

     A. **Repeated & Violent Demands to Conduct**
       **Warrantless Search**………………………………………….2-8

     B. **Any Consent by Maggie Was Obtained by Coercion**………………8-9

III.   **The Officers Used Excessive Force in Unjustifiably**
     **Detaining and Arresting Marty**………..………………………..….…9-10

IV.   **The Officers Are Not Entitled to Qualified Immunity**.......…..............10-11

V.    **The Officers Who Did Not Physically Arrest Marty or**
     **Search Maggie's Apartment Are Themselves Liable**…….....…………11-12

VI.   **City of Escondido's Liability**…………………………………..……..12-13

VII.  **Conclusion**…………………………………………………………..……13

PLS.' OPP. TO DEFS.' MOT. SUM. JT.                             3:14-cv-1662

1

## TABLE OF CASES

2

**Page(s)**

3

Billington v. Smith,

4
     292 F.3d 1177, 1189 (9th Cir. 2000) …………………………………10

5

Dubner v. City & Cnty. of San Francisco,

6
     266 F.3d 959, 965 (9th Cir. 2001) ……………………..…………………1

7

Johnson v. United States,

8
     333 U. S. 10, 14-15……………………………………..……………5

9

Martin v. City of Oceanside,

10
     360 F.3d 1078, 1080 (9th Cir. 2004) …………………………5, 6, 7, 8, 10

11

McDonald v. United States,

12
     335 U. S. 451, 454-56 (1948) ……………………………..……………5

13

Mincey v. Arizona,

14
     437 U.S. 385, 392 (1978) ………………..……………………………3, 4

15

Monell v. Dep't of Soc. Servs. of New York City,

16
     436 U.S. 658, 691 (1978) …………………………………………12, 13

17

Pavao v. Pagay,

18
     307 F.3d 915, 919 (9th Cir. 2002) …………………..……………………1

19

Payton v. New York,

20
     445 U.S. 573, 585 (1980) …………………………………………………3

21

Pearson v. Callahan,

22
     555 U.S. 223, 232 (2009) …………………………………………10, 11

23

Root v. Gauper,

24
     438 F.2d 361, 364-65 (8th Cir. 1971) …………………………….……4, 8

25

Schneckloth v. Bustamonte,

26
     412 U.S. 218, 227 (1973) …………………………………………………9

27

28

**Page(s)**

Tolan v. Cotton,
    134 S. Ct. 1861, 1866-68 (2014) …………….…..………………………11

United States v. Barone,
    330 F.2d 543, 544-45 (2d Cir. 1964) ……...………………………….…4

United States v. Black,
    482 F.3d 1035 (9th 2007) ……………….………………..……………11

United States v. Brooks,
    367 F.3d 1128 (9th Cir. 2004) …………….…………..………………11

United States v. Brown,
    392 Fed App'x 515 (9th Cir. 2010) ………………...…………………11

United States v. Cervantes,
    219 F.3d 882, 888-91 (9th Cir. 2000) …………………………3, 4, 5

United States v. Edwards,
    761 F.3d 977, 984-85 (9th Cir. 2014) …………………..……………3

United States v. James,
    408 F. Supp. 527, 533 (S.D. Miss. 1973) ………………………………5

United States v. Martinez,
    406 F.3d 1160, 1164 (9th Cir. 2005) …………………………………11

United States v. Moore,
    483 F.2d 1361, 1364 (9th Cir. 1973) …………………….……………10

United States ex rel. Parson v. Anderson,
    354 F. Supp. 1060, 1086-87 (D. Del. 1972) …………………………5

United States v. Ritter,
    752 F.2d 435, 439 (9th Cir. 1985) ………………………..……………9

United States v. Stafford,
    416 F.3d 1068, 1073-74 (9th Cir. 2005) ……………..………………3, 4

iii

1

**Page(s)**

2  United States v. Sutton,

3        794 F.2d 1415,1426 (9th Cir. 1996) …………………………………………3, 4

4  Warden v. Hayden,

5        387 U. S. 294, 298-99 (1967) ………………………….…………………5

6  Wayne v. United States,

7        318 F.2d 205, 209-14 (D.C. Cir. 1963) ……………...…………………4, 5

8  Welsh  v.  Wisconsin,

9        466  U.S.  740,  749-50 (1984) ……………………………..……………7

10 Wolf v. City of Stockton,

11        2010 WL 761087, at *5 (E.D. Cal. Mar. 4, 2010) …………..……………3, 4

12

13                **CALIFORNIA STATUTORY AUTHORITY**

14

15 California Penal Code section 148(a)(1)…………………………...…………………9

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs hereby oppose Defendants' Motion for Summary Judgment, (ECF No. 33).  Plaintiffs incorporate herein by this reference the Statement of Undisputed Facts set forth in Plaintiffs' own Motion for Summary Judgment, (ECF No. 34-3 at 2-16.)

Plaintiffs first address Defendants' arguments regarding the burden of proof applicable here, after which Plaintiffs address Defendants' arguments regarding the constitutional violations suffered by Maggie and Marty.  Plaintiffs then address Defendants' arguments that the officers here are entitled to qualified immunity.  Finally, Plaintiffs address the liability of officers who did not physically arrest Marty or search Maggie's apartment.

## I.    Burden of Proof

Defendants assert they have "the burden of going forward with evidence to meet the presumption of unreasonableness arising from the lack of a warrant," that they "may satisfy that burden by producing evidence of a recognized exception to the warrant requirements," and that, "[o]nce the defendant has done so, the ultimate risk of non-persuasion remains squarely on the plaintiff in accordance with established principles governing civil trials."  (ECF No. 33-1 at 16.)  In support of these assertions, Defendants cite Pavao v. Pagay, 307 F.3d 915, 919 (9th Cir. 2002), and Dubner v. City & Cnty. of San Francisco, 266 F.3d 959, 965 (9th Cir. 2001).  These cases, however, do not support Defendants' assertions.

The court in Pavao did not hold that "the ultimate risk of non-persuasion [whatever that means] remains squarely on the plaintiff."  The Pavao court observed merely that, "[i]n a civil case under 42 U.S.C. § 1983 . . . , the plaintiff carries the ultimate burden of establishing each element of his or her claim, including lack of consent."  Pavao, 307 F.3d at 919.  Plaintiffs do not dispute that they bear the ultimate burden of proof as to their section 1983 claims.  As the court in Dubner observes, however, Defendants bear the ultimate burden of production as to any claim that an exception to the warrant requirement applied here.  Dubner, 266 F.3d at 965.

1

**II.    The Officers Violated Maggie's Fourth Amendment Rights**

   **A.    Repeated & Violent Demands to Conduct Warrantless Search**

   Defendants argue "[t]he gravamen of the FAC as it relates to the demands to enter Maggie's apartment to conduct a welfare check appears to be that the officers were limited to an investigation into <u>Ametria's</u> well-being <u>only</u>," and that "this claimed investigatory limitation is constitutionally too narrow and unreasonable under the circumstances." (ECF No. 33-1 at 17.)  Defendants misconceive the gravamen of the FAC.

   The gravamen of Plaintiffs' FAC is that, when the officers arrived on scene in response to Douglas's mother's 911 call, the officers were not confronted with any indications of an ongoing emergency—even less so an ongoing emergency requiring a warrantless entry and search of Maggie's apartment.  Plaintiffs complain that the responding officers' insistence on searching Maggie's apartment, all the while failing to conduct even the simplest investigation of those who might have been witness to any emergency (including questioning Douglas who was only feet away from the subject apartment when the officers arrived), compounded the unreasonableness of the officers' repeated and violent demands to search Maggie's apartment.

   Defendants argue "[i]t is undisputed that the Defendants were <u>credibly</u> advised by police dispatch that there was a potentially life threatening event in the apartment before they knocked and demanded entry." (ECF No. 33-1 at 17.)  Defendants, however, provide no evidence that the information Douglas's mother provided to 911 dispatchers, and that dispatchers then relayed to the officers, was credible.  Indeed, <u>none</u> of the responding officers even attempted to follow-up with Douglas's mother (even though they had her phone number) to garner more information as to the credibility of the 911 call.  Neither did any of the officers attempt to interview a <u>single</u> neighbor or other potential witnesses regarding any of the alleged events giving rise to the 911 call.

Defendants argue that the officers' "reliance on the dispatch information that there was a potential emergency necessitating entry into Maggie's apartment was reasonable," citing United States v. Edwards, 761 F.3d 977, 984-85 (9th Cir. 2014). (ECF No. 33-1 at 17.)  At issue in Edwards was whether an investigatory detention (i.e., not an arrest) of a pedestrian in a public place was justified by an anonymous 911 call with several "circumstances" of reliability not present here.  Edwards, 761 F.3d at 981-85.  The warrantless entry into and search of a home is constitutionally different than a brief investigatory detention in a public place.  See Payton v. New York, 445 U.S. 573, 585 (1980) ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed").  Edwards is therefore inapposite.

Defendants further assert "[t]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."  (ECF No. 33-1 at 17.)  In support of this assertion, Defendants cite Mincey v. Arizona, 437 U.S. 385, 392 (1978) (discussed below), United States v. Sutton, 794 F.2d 1415,1426 (9th Cir. 1996) (discussing only whether an investigatory traffic stop was justified), United States v. Cervantes, 219 F.3d 882, 888-91 (9th Cir. 2000) (setting forth elements for application of emergency exception and finding it applied where the officer himself smelled strong odors indicating the presence of a volatile meth lab), United States v. Stafford, 416 F.3d 1068, 1073-74 (9th Cir. 2005) (emergency exception did apply where two 911 callers reported the following: a home might contain a dead body, there were large quantities of blood and feces, the master bedroom looked like there had been a "brawl," there were copious quantities of hypodermic needles, and there was a putrid smell that seemed to be coming from the bathroom; and before entering, the officers confirmed those details with witnesses), and Wolf v. City of Stockton, 2010 WL 761087, at *5 (E.D. Cal. Mar. 4, 2010) (emergency exception did apply where father reported specific information of child neglect and officers corroborated father's report upon

3

arrival and before searching home).  Given the stark contrast between the facts of this case and those in <u>Sutton</u>, <u>Cervantes</u>, <u>Stafford</u>, and <u>Wolf</u>, these cases provide little guidance here.

And while Defendants' accurately quote language from <u>Mincey</u>, (<u>see</u> ECF No. 33-1 at 17), the holding in <u>Mincey</u> has little bearing on this case.  There, the Supreme Court held that Arizona's judicially created rule "that a <u>possible</u> homicide presents an emergency situation demanding immediate [entry into a home]" was "inconsistent with the Fourth and Fourteenth Amendments."  437 U.S. at 395.  In ruling this "murder scene exception" unconstitutional, the Supreme Court observed, "It may well be that the circumstances [giving rise to the exception] . . . warrant a search of substantial scope.  But the Fourth Amendment requires that this judgment in each case be made in the first instance by a neutral magistrate."  <u>Id.</u>

If <u>Mincey</u> governs at all in this case, Defendants have not presented compelling evidence (as they must to prevail on their Motion for Summary Judgment) that they reasonably believed a person was in need of immediate aid within Maggie's apartment.  The officers' own conduct indicates they did not believe that was the case, and the officers themselves admit they thought, at most, there was only a "potential" for someone to be in need of immediate aid.

Moreover, this case is nothing like the federal cases the <u>Mincey</u> court cited as examples of when the emergency exception did and did not apply.  <u>See Mincey</u>, 437 U.S. 392 n.7 (citing <u>Root v. Gauper</u>, 438 F.2d 361, 364-65 (8th Cir. 1971) (holding exception did <u>not</u> apply where, as is the case here, officers <u>waited several minutes</u> before entering home, noting such action was not consistent with the actions of someone "who believes that wounded persons might be lying inside the house awaiting attention"); <u>United States v. Barone</u>, 330 F.2d 543, 544-45 (2d Cir. 1964) (exception did apply where officers themselves heard "loud screams in the dead of night"); <u>Wayne v. United States</u>, 318 F.2d 205, 209-14 (D.C. Cir. 1963) (exception

4

did apply where the sister of victim escaped imprisonment from home and reported to police that the victim, her unconscious sister, remained in the home); United States v. James, 408 F. Supp. 527, 533 (S.D. Miss. 1973) (exception did apply where officers were executing a felony arrest warrant and, before entering the house, had exchanged gunfire with the occupants, resulting in the death of one officer); United States ex rel. Parson v. Anderson, 354 F. Supp. 1060, 1086-87 (D. Del. 1972) (stating only that, "[e]ven the privacy of a dwelling may be invaded where life is at stake."); Warden v. Hayden, 387 U. S. 294, 298-99 (1967) (exception applied where witnesses followed a fleeing robber to a home that police subsequently searched); McDonald v. United States, 335 U. S. 451, 454-56 (1948) (exception did not apply because this was "not a case where the officers, passing by on the street, hear[d] a shot and cry for help and demand[ed] entrance in the name of the law"); Johnson v. United States, 333 U. S. 10, 14-15 (exception did not apply where the only reason for not obtaining a warrant was "the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate")).  In each of the above cases where the emergency exception applied, police officers either (1) witnessed an emergency themselves, or (2) upon receiving a report of an emergency, corroborated witness accounts before making a warrantless entry.  Any reliance on Mincey by Defendants is misplaced.

Finally turning to the elements required for application of the emergency exception, see United States v. Cervantes, 219 F.3d 882, 888 (9th Cir. 2000), Defendants cite Martin v. City of Oceanside, 360 F.3d 1078, 1080 (9th Cir. 2004), for the proposition that the officers' actions in this case fell under the emergency exception.  (ECF No. 33-1 at 19.)  As Defendants implicitly acknowledge, however, the facts in Martin are far different than the facts of this case.  In Martin, a father had not heard from his daughter for several days, so he called the Oceanside Police Department from his home in Oregon to report that he was "extremely concerned" and

5

to request a welfare check on his daughter.  360 F.3d at 1080.  An officer went to the daughter's house, where he began corroborating the father's report.  The officer first discovered a car that matched the father's description.  Id.  The officer knocked on the door, and there was no answer.  Id.  The officer had headquarters call the daughter's phone, and there was no answer.  Id.  The officer called for backup then went to a neighbors house to interview potential witnesses, where the officer learned a woman had been seen at the residence in question three days earlier and a man one day earlier, and that because both the woman's and man's cars were home, they should also be home.  Id.  After backup arrived, the officers entered the daughter's residence through an open garage door with flashlights and guns drawn.  Id. at 1081.  The officers encountered the daughter and immediately asked the daughter to identify herself.  Id.  The daughter produced identification, the officers confirmed she was safe, then the officers left "shortly thereafter."  Id.

Martin is easily distinguishable.  Unlike the father in Martin who had not heard from his daughter in several days, Douglas's mother heard only a verbal argument between Douglas and her female roommate, Maggie.  Unlike the daughter in Martin, Maggie did not ignore the officers' knocks and demands for entry; Maggie immediately approached her living room window and, over several minutes, repeatedly confirmed that no one was hurt or in danger and that she wanted the officers to obtain a warrant before searching her apartment.  Unlike the officers in Martin, the officers here stood at Maggie's door and window for several minutes, threatening to kick down the door, and never actually charging into Maggie's apartment, as have all the officers done in cases where the emergency exception has applied.  Unlike the officers in Martin, the officers here did not ask anyone for identification until well into the encounter and, indeed, after they had searched Maggie's apartment.  Finally, unlike the officers in Martin, the officers here did not check on the person they were sent to check on (i.e., Douglas), then leave.  From the

moment they responded, the officers here were determined to search Maggie's apartment—even if the person whose welfare they were sent to check on was playing with children in a pool when the officers arrived.

When the officers arrived at Maggie's apartment, the officers had no reasonable basis to believe the person the officers were sent to check on (i.e., Douglas) was in any danger. The officers here cannot justify their repeated and violent demands to conduct a warrantless search of Maggie's apartment by their failure to conduct the simplest of police investigations: asking for identification. Had the officers bothered to engage with Douglas when she asked them why they were there, the officers could have confirmed Douglas's identification and then left the scene. See Martin, 360 F.3d at 1081. Instead, the officers had decided, even before they arrived, that they were going to search Maggie's apartment.

Defendants claim the need to search Maggie's apartment "was not diminished by events observed or information received by the officers once they arrived on scene." (ECF No. 33-1 at 20.) Defendants assert that "a reasonable officer could readily believe that Maggie's angry and emotional interaction with the officers . . . could be contrived or outright false due to some threat by someone . . . hiding in the apartment or for some other reason related to her actions." (Id. at 20-21.) There is, however, one major problem with Defendants' assertion. It is entirely speculative.

"[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984). To prove that such circumstances existed, the government cannot rely on "speculation about what may or might have happened." United States v. Howard, 828 F.2d 552, 555 (9th Cir. 1987).

Defendants' assertion that Maggie's reaction to their presence "could be contrived" due to "some threat by someone" or "for some other reason" hardly

satisfies the "heavy burden" that Defendants bear in justifying their repeated and violent demands to search Maggie's apartment.

Moreover, whether Maggie was "angry and emotional" is irrelevant without context and, in any event, raises a dispute of material fact. Maggie clearly explained to police she was upset because she had had a scary experience with the same department a month prior. She explained she was upset because the police were demanding a warrantless entry into her home without any clear explanation as to what prompted their presence. She explained she would let the police in if they got a warrant. While the officers here had time to wait around and talk to Maggie through the window, wait around for other officers to arrive, and wait around to formulate plans, the officers apparently did not have enough time to obtain a warrant. See Root, 438 F.2d at 364-65 (holding exception did not apply where, as is the case here, officers waited several minutes before entering home, noting such action was not consistent with the actions of someone "who believes that wounded persons might be lying inside the house awaiting attention"); see also Martin, 360 F.3d at 1081 (once two officers were on scene, the officers immediately entered the residence to perform a welfare check with guns and flashlights drawn).

Any argument by Defendants that Maggie frustrated the officers' investigation, (see ECF No. 33-1 at 21), is belied by Defendants' own failure to clearly inform those present that they were there because someone had reported a potential disturbance between Douglas and her female roommate, in addition to Defendants' own failure to even attempt to confirm anyone's identification until after they had searched Maggie's apartment.

## B.   Any Consent by Maggie Was Obtained by Coercion

Defendants argue Maggie "objectively demonstrated a change in mind as to giving [the officers] permission to enter." (ECF No. 33-1 at 22.) Defendants argue Maggie changed her mind after talking to Leffingwell, "a trained PERT officer." (Id.)

8

Defendants, however, are wrong regarding the impetus for Maggie's statement that the officers could search her house.

Contrary to Defendants' implication that Maggie changed her mind because Leffingwell made a "connection" with Maggie, Maggie was in fact terrified for the safety of her father and children who were, at this point, screaming from the pool in response to the officers arresting their grandfather, Marty.  Any consent by Maggie was not voluntary; it was coerced.  If anything, this raises a dispute of material fact.  See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973) ("whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact"); United States v. Ritter, 752 F.2d 435, 439 (9th Cir. 1985) ("[v]oluntariness is a question of fact").

**III.  The Officers Used Excessive Force in Unjustifiably Detaining and Arresting Marty**

Defendants argue: "Not only did Officer Craig have probable cause to believe that Marty was obstructing the officers' efforts to investigate the 9-1-1 call and determine the safety of the occupants, the undisputed record supports that Marty in fact intended to obstruct and delay the officers."  (ECF No. 33-1 at 24.)  In support of their argument, Defendants assert "Officer Craig approached Marty as he was suddenly leaving the apartment through the front door, properly ordered him not to close the door, and Marty made physical contact with the officer pushing him out of the way and closing the door."  (Id. at 23.)  Thus, Defendants' assertion of probable cause to arrest Marty for a violation of California Penal Code section 148(a)(1) rests entirely on whether Marty was "properly ordered . . . not to close the door."

The problem with Defendants' assertion, however, is that Marty was never "properly ordered . . . not to close the door," nor did Marty ever push any officer out of the way.  Neither Marty nor Douglas (who was within earshot of the front door to the apartment) heard any clear command not to close the door.  When Marty first

9

1  exited the apartment and closed the door, no officer was visible from the front door.

2  And when Marty closed the door, he was facing the door.  Marty's first contact with

3  any officer was when Craig grabbed Marty and forced him to the ground.

4       Moreover, Marty would never have been arrested if the officers had simply

5  talked to Douglas, confirmed her identity and safety, then left.  See Martin, 360 F.3d

6  at 1081.  The officers cannot now justify their arrest of, and use of excessive force on,

7  Marty by circumstances they created through their own actions.  See Billington v.

8  Smith, 292 F.3d 1177, 1189 (9th Cir. 2000) (officers "could . . . be held  liable  for

9  using excessive  force because their reckless and unconstitutional provocation created

10  the need to use force"); see also United States v. Moore, 483 F.2d 1361, 1364 (9th Cir.

11  1973) ("The right to resist an unlawful arrest was well established at common law.").

12       Defendants claim Marty "was heard directing Maggie to get away from the

13  window . . . , he never announced his departure from the apartment or his intentions

14  for leaving, he never identified himself . . . , and he disregarded a direct order not to

15  close the door while pushing past . . . Officer Craig."  (ECF No. 33-1 at 25.)  The

16  fearsome picture Defendants try to paint of Marty is belied by one simple statement

17  Craig made when the officers heard Marty talking to Maggie within the apartment.

18  And that is Craig's statement that Marty "was trying to talk some sense into

19  [Maggie]."  Whether the officers were actually concerned that Marty posed a safety

20  risk presents a dispute of material fact; though, it appears undisputed that the officers

21  (at least Craig) believed Marty was attempting to assist the police by trying to "talk

22  some sense into [Maggie]."

23  **IV.   The Officers Are Not Entitled to Qualified Immunity**

24       In arguing the officers are entitled to qualified immunity as to the search of

25  Maggie's apartment, Marty's arrest, and the use of force on Marty, Defendants argue

26  no constitutional violations occurred.  See Pearson v. Callahan, 555 U.S. 223, 232

27  (2009) (explaining that, to determine whether  an  officer  is  entitled  to  qualified

immunity, courts must consider whether (1) the officer's conduct violated a constitutional right and (2) that right was clearly established at the time of the incident).  As set forth above, and viewing the officers' actions in a light most favorable to Plaintiffs, see Tolan v. Cotton, 134 S. Ct. 1861, 1866-68 (2014), Defendants violated Plaintiffs' constitutional rights.  Defendants do not attempt to argue these rights were not clearly established at the time the officers violated Plaintiffs' rights.

All constitutional violations in this case arise from the officers' repeated and violent demands to conduct a warrantless search of Maggie's apartment based on a 911 call that police failed to reasonably investigate upon arriving at Maggie's apartment.  It is undisputed that the officers were determined to search Maggie's apartment no matter the circumstances they encountered upon arriving at the apartment.  This determination also resulted in the unlawful arrest of, and use of force on, Marty.  It is, however, well established that a report of potential domestic violence does not give rise to a per se exception to the warrant requirement.  And this right was well established before the incident giving rise to this case.  See United States v. Brooks, 367 F.3d 1128 (9th Cir. 2004); United States v. Martinez, 406 F.3d 1160, 1164 (9th Cir. 2005); United States v. Black, 482 F.3d 1035 (9th 2007); United States v. Brown, 392 Fed App'x 515 (9th Cir. 2010).  In sum, the officers here are not entitled to qualified immunity.

**V.    The Officers Who Did Not Physically Arrest Marty or Search Maggie's Apartment Are Themselves Liable**

Defendants argue "[t]here is no evidence" showing the officers that did not physically arrest Marty or search Maggie's apartment either (1) failed to intercede to prevent the violation of Plaintiffs' constitutional rights, or (2) failed to appropriately supervise subordinates.  (ECF No. 33-1 at 29.)  Defendants argue, "taking the

1  individual Defendants separately, none had a realistic opportunity to intercede in any

2  claimed violation of either Plaintiff."  This is false.

3       The officers here stood at Maggie's doorway while waiting for, not only a

4  supervisor to arrive, but for other patrol officers to arrive–all the while violently

5  demanding that Maggie open the door or they would kick it down, and all the while

6  failing to even confirm the identify of the person with whom they were speaking.  For

7  upwards of twenty minutes, not a single officer present attempted to prevent other

8  officers from repeatedly and violently demanding that Maggie permit them to conduct

9  a warrantless search of her apartment.

10      Upon Toth's arrival, he was briefed up until the time Marty exited, at which

11  point Toth assisted Craig in arresting Marty by applying pressure to Marty's shoulder.

12  Even after Marty's arrest, when Toth's briefing resumed, Toth still did not attempt to

13  stop any of his subordinates from continuing to demand that Maggie submit to a

14  warrantless search of her apartment.  Even Leffingwell–who arrived several minutes

15  after Craig, Houchin, and Toth–was determined to search Maggie's apartment no

16  matter the circumstances he encountered upon arrival.

17      In sum, disputes of material fact remain as to whether the officers who did not

18  physically participate in Marty's arrest or the search of Maggie's apartment are liable

19  for failing to appropriately intercede or supervise.

## VI.   City of Escondido's Liability

21      Defendants argue "without any predicate constitutional harm inflicted by the

22  Defendant officers, there can be no municipal liability," citing Monell v. Dep't of Soc.

23  Servs. of New York City, 436 U.S. 658, 691 (1978).  (ECF No. 33-1 at 31.)  While a

24  correct legal proposition, Defendants did in fact inflict constitutional violations on

25  Plaintiffs, as set forth above.  At best, there are dispute of material fact as to whether

26  such constitutional violations occurred.  The City of Escondido's liability as a

27  municipality thus remains to be determined.  As to Carter and Moles, however,

12

1 | Plaintiffs do not, in principal, oppose their dismissal without prejudice as to Plaintiffs'

2 | Monell claims.

3 | **VII.   Conclusion**

4 | For the foregoing reasons, Defendants' Motion for Summary Judgment, (ECF

5 | No 33), should be denied.

6 |

7 | Dated: December 28, 2015                SINGLETON LAW FIRM, APC

8 |                                                      By:     */s/ Brody McBride*
                                                                Brody McBride
9 |                                                      Attorneys for Plaintiffs

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

13